**Lee VAN ORMER, Edward Marucci, and John T. Clancey**

v.

**ASPEN TECHNOLOGY, INC., et al.**

**Civil Action Nos. 98–12018–RWZ, 98–12379–RWZ, 98–12158–RWZ.**

United States District Court, D. Massachusetts.

Oct. 31, 2000.

---

Steven Schulman, Samuel H. Rudman, Michael A. Swick, Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, Jeffrey R. Krinsk, Finkelstein & Krinsk, San Diego, CA, Nancy F. Gans, Stephen Moulton, Moulton & Gans, LLP, Boston, MA, for plaintiffs.

Thomas J. Dougherty, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, for defendants.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

Plaintiffs Lee Van Ormer, Edward Marucci, and John T. Clancey bring this class action on behalf of themselves and all others who purchased the common stock of defendant Aspen Technology, Inc. ("Aspen") between January 27, 1998 and October 2, 1998. They claim violations of §§ 10(b) and 20(a) of the Securities Exchange Act[1] by Aspen and three individual defendants, Lawrence B. Evans (Chairman of the Board, CEO, and principal founder of Aspen), Joseph F. Boston (President, board member, and founder), and Mary A. Palermo (Executive Vice President–Finance and CFO). Aspen supplies software and services for the analysis, design, and automation of process manufacturing plants in a range of industries from chemicals, petroleum, pharmaceuticals, electric power, pulp and paper, to metals.

During the class period, at its high, Aspen stock rose to $55.25 per share. Aspen's announcement of its earnings on July 28, 1998, lower than predicted by analysts, caused its stock to drop from $48.25 to $26.25. In October of 1998, Aspen's stock dropped again from $24.00 to $7.375 when it announced that its earnings for the first quarter of 1999 were lower than expected. Plaintiffs allege that, from January through September of 1998, defendants made misrepresentations and misleading statements about the health and prospects of Aspen causing its stock price to become artificially inflated. Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 9(b). For the following reasons, defendants' motion is granted.

### Pleading Standards

In order to sufficiently allege securities fraud, plaintiffs must comply with the pleading standards of Rule 9(b) as well as the Private Securities Litigation Reform Act (PSLRA). 15 U.S.C. § 78u–4. Rule 9(b) requires plaintiffs to state with particularity the circumstances constituting the fraud. Fed.R.Civ.P. 9(b). The PSLRA, which was designed to eliminate baseless suits filed when a company's stock drops, heightens the Rule 9(b) standard by requiring that plaintiffs set forth "each statement alleged to have been misleading, the reason or reasons why the statement is misleading; and, if an allegation regarding the statement or omission is made on information and belief, [that] the complaint ... state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); see also Fitzer v. Security Dynamics Techs., Inc., 119 F.Supp.2d 12, 17 (D.Mass.2000). In order to allege scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

■ Before the enactment of the PSLRA, the First Circuit already enforced a rigorous pleading standard under Rule 9(b). See Suna v. Bailey Corp., 107 F.3d 64, 68 (1st Cir.1997). Since its enactment, the First Circuit has announced that "[t]he PSLRA's pleading standard is congruent and consistent with the pre-existing standards of this circuit." Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir.

---

1. Section 10(b) makes it unlawful for a person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device." 15 U.S.C. § 78j(b). Rule 10b–5, promulgated thereunder, further prohibits "any untrue statement of a material fact" or omission of facts neces-sary to prevent other statements from being misleading. 17 C.F.R. § 240.10b–5 (1998). Under section 20(a), any person who "controls" someone who violates the Exchange Act is also liable for the violation. See 15 U.S.C. § 78t(a).

1999). Those standards require that the complaint (1) specify the time, place, and content of each allegedly misleading statement or omission, (2) explain and provide factual support for why the statement is fraudulent, (3) provide specific factual allegations to support a reasonable inference that adverse circumstances existed at the time of the statements and were known and deliberately or recklessly disregarded by defendants, and (4) set forth the source of the information and reasons for the belief when allegations are made on information and belief. *See id.* at 193–94.

### Basis for Plaintiffs' Allegations

The allegations in plaintiffs' Amended Complaint are based on an investigation conducted by their attorneys, including a review of public documents and discussions with former Aspen employees, clients, and consultants. Plaintiffs fail to provide any information about the Aspen contacts with whom their attorneys had discussions. *Cf. Fitzer,* 119 F.Supp.2d at 20 (finding particularity requirements met only because *specific positions* of employee-contacts were provided).

■ Pleading based on investigation by counsel is similar to pleading on information and belief; the complaint must specify the facts upon which the information is based. *See Lirette v. Shiva Corp.,* 999 F.Supp. 164, 165 (D.Mass.1998) (under PSLRA allegations based upon investigation by counsel are "no longer an acceptable approach to pleading"); *In re Silicon Graphics, Inc. Sec. Litig.,* 970 F.Supp. 746, 763 (N.D.Cal.1997) (pleadings based on investigation of counsel are the same as those based on information and belief). The plaintiffs, therefore, must specify facts to support their allegations.

### Why Statements Are Fraudulent

■ In paragraph 2, the Amended Complaint attempts to explain why the defendants' statements are fraudulent. Thereafter, each statement cited by plaintiffs is alleged to be materially false and misleading "for the reasons stated in paragraph 2."[2] Consequently, plaintiffs' entire case depends upon the sufficiency of the allegations in paragraph 2. Keeping in mind that plaintiffs shoulder the burden of alleging specific facts to support these beliefs, I will separately analyze the six parts of paragraph 2.

In paragraph 2(a), plaintiffs assert that sales of Aspen's core products were stagnating. To support this allegation, plaintiffs claim that defendants received "sales pipeline reports" that contained this information. However, plaintiffs never specify which reports contained this information, the date of such reports, the exact information in the reports, or who received them. *See Lirette v. Shiva Corp.,* 27 F.Supp.2d 268, 283 (D.Mass.1998) ("General allusions to unspecified internal corporate information are insufficient to withstand a motion to dismiss.") (citations omitted); *In re Boston Tech., Inc. Sec. Litig.,* 8 F.Supp.2d 43, 57–58 (D.Mass. 1998) (requiring that documents and internal reports be specifically identified). Plaintiffs simply do not provide facts to support their allegation that Aspen was suffering from weak product demand or that defendants knew such information. *See Fitzer,* 119 F.Supp.2d at 27 (dismissing complaint when plaintiff failed to show with particularity the extent to which demand slowed); *Lirette,* 27 F.Supp.2d at 282–83 (finding bald assertions of weaken-

---

**2.** The few instances when plaintiffs do not cite to paragraph 2 directly, they nevertheless use information from paragraph 2 to support the supposed falsity of the statements. *See* Am. Compl. ¶¶ 51, 52, 56, 60, 61, 64, 66, 68.

ing product demand insufficient to support securities fraud claim). Moreover, allegations that *two* of Aspen's core products were showing weak sales are, by themselves, immaterial since *overall* sales of Aspen's core products could still have been increasing.

In paragraph 2(b), plaintiffs allege that Aspen's sales were achieved through a "slash and burn" discounting policy. Plaintiffs fail to allege who at Aspen provided these discounts, who received them, the amount of the discounts, when they were provided, or which products were discounted. *See Fitzer*, 119 F.Supp.2d at 36 (in order to allege "extraordinary discounts" plaintiffs must show "at a minimum, some particular transactions where revenues were improperly recorded, including the names of the customers, the terms of specific transactions, when the transactions occurred, and [their] approximate amount") (quotation marks and citations omitted); *In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F.Supp.2d 211, 226 (D.Mass.1999) (allegations insufficient when "[w]e are not told which licensees received offers of deep discounts"). Moreover, "[i]t is widely known that list prices are often significantly higher than street prices." *Fitzer*, 119 F.Supp.2d at 36; *see also Greebel*, 194 F.3d at 189, 203 (affirming dismissal when plaintiffs alleged discounts as high as 90% partly because "there may be any number of legitimate reasons for attempting to achieve sales earlier").

Plaintiffs argue, in paragraph 2(c), that defendants made baseless revenue projections. Yet, plaintiffs again fail to factually support the alleged inadequacy of any projections. Conclusory allegations that "defendants knew ... revenue projections ... were arbitrary and baseless because sales managers repeatedly brought" it to the attention of senior management are simply insufficient to survive a motion to dismiss. Am.Compl. ¶ 2(c). Allegations supported only by unidentified "sales managers" who got their information from unspecified sources fall woefully short of meeting particularity requirements. *See, e.g., Suna*, 107 F.3d at 71 (affirming dismissal where plaintiffs "offer[ed] no factual support for their conclusory allegations that [defendant] knew" of adverse information).

In paragraph 2(d), plaintiffs claim that Aspen's products were plagued with technical problems because they were released too early. Plaintiffs, however, specify only one product, the Aspen Plus. They then vaguely allude to threatened legal proceedings by Dow Chemical and Weyerhauser because of the purportedly defective product. Technical problems can result from any number of factors; they may have no relation to the premature release of a product. Plaintiffs also fail to offer factual support for their claim that Aspen Plus was released early "in order to create the false appearance of an increasing revenue stream" or that sales of Aspen Plus alone had a significant impact on overall revenues. Most importantly, this allegation amounts to nothing more than complaints of poor management, not securities fraud. *See, e.g., Fitzer*, 119 F.Supp.2d at 31 ("poor management is a risk that every investor takes" and "[d]amages flowing therefrom are not actionable under the securities laws"); *In re Number Nine Visual Tech. Corp. Sec. Litig.*, 51 F.Supp.2d 1, 22 n. 18 (D.Mass.1999) ("Mismanagement claims are not actionable under federal securities laws.") (citation omitted). Defendants were under no obligation to disclose technological problems with their products, regardless. *See In re Boston Tech.*, 8 F.Supp.2d at 62–63 ("[D]efendants were not obliged to disclose the allegedly unresolved bugs in the first place.").

Plaintiffs argue, in paragraph 2(e), that Aspen did not have a reasonable basis for its earnings projections because Aspen lacked a global cost reporting system. This grievance likewise sounds in mismanagement rather than securities fraud. Plaintiffs also fail to set forth any specific facts explaining why Aspen's earnings projections were unacceptable or why the method that Aspen utilized was inadequate. *See Suna*, 107 F.3d at 68 (future optimistic predictions are only actionable if plaintiffs demonstrate intentional deception) (citation omitted). In fact, plaintiffs never even challenge defendants' reported figures of past performance. *See, e.g., Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir.1994) ("[D]efendants may not be held liable ... for accurate reports of past successes, even if present circumstances are less rosy.") (citation omitted).

■ Finally, in paragraph 2(f), plaintiffs complain that Aspen's acquisitions encountered integration problems. Not only is this another allegation of mismanagement, but Aspen specifically warned about the potential for integration problems under "Risk Factors" in its Form 8–K SEC filing. Plaintiffs also fail to offer any factual support for Aspen's alleged acquisition problems; they certainly do not raise a strong inference that defendants knew of such problems. *See, e.g., Suna*, 107 F.3d at 71 (rejecting "the legitimacy of alleging 'fraud by hindsight' ") (quotation marks and citation omitted); *Serabian*, 24 F.3d at

367 (finding deficient allegations that "defendants must have known the severity of their problems earlier because conditions became so bad later on") (citations omitted). Besides, optimistic statements about the success of a merger are not actionable, regardless. *See Fitzer*, 119 F.Supp.2d at 31. Such statements "could only be viewed as false if, at the time they were made, [defendant] had totally abandoned the idea of integrating the companies." *Id.* at 30. Plaintiffs raise no such inference.

Essentially, paragraph 2 consists of nothing more than the kind of unsupported, baseless allegations that Rule 9(b) and the PSLRA are designed to prevent. Because paragraph 2 is the only statement of facts to support the alleged falsity of defendants' statements, the entire complaint falls.

*Analysis of Defendants' Statements*

■■ Even if plaintiffs offered factual support for paragraph 2, the complaint would still be deficient because the alleged fraudulent statements themselves fail to meet pleading requirements under Rule 9(b) and the PSLRA.[3] Statements cited by plaintiffs[4] constitute corporate puffery, lack falsity, cannot be attributed to defendants, are protected by cautionary disclosures, or suffer from a combination of these ailments.

Statements in paragraphs 26, 28, 29, 31, 33, 35, 39, 41, 43, 47, 48, 53, 57, 61, 65, 66, and 67 are nothing more than corporate

---

**3.** When considering dismissals of 10b–5 cases, courts in this circuit typically engage in a separate analysis of each statement. *See In re Boston Tech.*, 8 F.Supp.2d at 55–56; *but see Greebel*, 194 F.3d at 207 (stating summarily that defendants' "upbeat statements of optimism ... have each been reviewed and we conclude that they are not actionable"). However, because this case warrants dismissal under the inadequacies of paragraph 2

alone, (since each statement is allegedly false for "the reasons stated in paragraph 2"), it is unnecessary to examine the alleged statements at all. In this *arguendo* context, I will therefore address the statements in groups.

**4.** This analysis excludes statements that plaintiff cites but does not allege are false. *See* Am.Compl. ¶¶ 50, 54, 69, 70.

puffery.[5] *See Fitzer,* 119 F.Supp.2d at 22 ("[t]he corporate puffery rule applies to loose optimism about both a company's current state of affairs and its future prospects" such as statements that company is "well positioned") (citation omitted); *Pacheco v. Cambridge Tech. Partners, Inc.,* 85 F.Supp.2d 69, 79–81 (D.Mass.2000) (citing as puffery statements that defendants were "comfortable" with analysts' estimates and would meet analysts' expectations) (citations omitted); *In re Boston Tech.,* 8 F.Supp.2d at 54 (puffery rule covers "exaggerated, vague, or loosely optimistic statements about a company"). Paragraphs 26, 29, 31, 33, 35, 37, 39, 41, 43, 46, 47, 48, 51, 52, 53, 56, 57, 60, 61, 62, 63, 65, 67, and 68 contain statements that are not false; paragraph 2, even if it were supported, does not explain why these statements are false.[6] In fact, some of defendants' predictions that plaintiffs claim were fraudulent when made, actually turned out to be accurate. *See* Def.'s Reply Mem. in Supp. of M. to Dismiss at 7 (plaintiffs claim that defendants' revenue prediction of $250 million in 1998 was fraudulent yet year-end revenues for 1998 reached $252.6 million).

Paragraphs 28, 33, 38, 44, 46, 47, 48, 52, 53, 56, 57, 58, 60, 62, 63, 64, 66, and 67 contain statements of analysts and others that cannot be attributed to defendants because plaintiffs fail to specify any statements made by defendants to these third parties.[7] *See Suna,* 107 F.3d at 73–74 (requiring plaintiffs to identify statements made by defendants to analysts); *In re Number Nine,* 51 F.Supp.2d at 30 (applying entanglement test and requiring plaintiff to allege time, place, content, and speaker of defendant's communications with analysts). Further, even if third-party statements could be imputed to defendants, plaintiffs fail to allege any facts that defendants knew they were false and misleading at the time they were made. Finally, statements in paragraphs 51, 67, and 68 are protected by cautionary disclosures made by Aspen in its SEC Form 8–K and 10–K filing. *See* 15 U.S.C. § 78u–5 (providing safe harbor for forward-looking statements accompanied by cautionary language); *see also Fitzer,* 119 F.Supp.2d at 30 (stating that "bespeaks caution" doctrine protects statements accompanied by cautionary language).

Finally, plaintiffs fail to meet scienter requirements since none of the allegations provides a strong inference of fraudulent intent. Not only do plaintiffs fail to adequately allege defendants' knowledge of adverse corporate information at the time of their statements, but no defendants are alleged to have engaged in unusual trading of any kind. *See In re Segue Software,* 106 F.Supp.2d at 171 (no scienter when

5. These include statements such as: "[w]e are very pleased with our performance"; "[m]anagement indicated confidence . . . for . . . calendar 1998"; "the purchase [of Chesapeake] will allow [Aspen] to enhance its software . . . and expand sales"; "defendant Evans confirmed that he was 'comfortable' with . . . analyst's earnings estimate"; "[w]e continue to believe that Aspen is an unusually solid company." Am.Compl. ¶¶ 26, 28, 43, 47, 57.

6. This includes statements such as: "the company does not expect this acquisition will result in material financial impact in fiscal 1998"; "We bought [IISYS] for the technology"; "we saw very good growth across our product family"; "the company says it expects its 1997 revenues of $180 million to grow to $250 million this fiscal year"; "[Aspen] has completed 15 acquisitions that have provided the Company with, or significantly enhanced, its capabilities in" various areas. Am.Compl. ¶¶ 31, 37, 39, 56, 68.

7. Plaintiffs make only vague accusations that analysts' reports were based upon: "reporting information provided by defendants"; "information provided by defendants"; "materially false information provided by defendants." 44, 48, 53.

plaintiffs did not allege either that defendants engaged in any suspicious sale of stock or other facts of fraudulent intent); *cf. Fitzer*, 2000 WL 1477204, at *10 (recognizing that scienter may be inferred from unusual trading activity by corporate insiders).

For all of the above reasons, plaintiffs have failed to allege a violation of section 10(b) of the Securities Exchange Act. Without a violation of section 10(b), there can be no section 20(a) liability. *See, e.g., In re Segue Software*, 106 F.Supp.2d at 172 (citation omitted). Accordingly, defendants' motion to dismiss the Amended Complaint[8] is granted. Judgment may be entered dismissing the Amended Complaint for failure to meet pleading requirements and thus failure to state a claim.

---

8. Dismissal on these grounds makes it unnecessary to address defendants' standing argu-ments.